UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

GREGORY D. MUNN,

                Plaintiff,

     v.

COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION,

                Defendant.

Civil No. 6:13-cv-00997-ST

FINDINGS AND
RECOMMENDATION

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Gregory D. Munn ("Munn"), seeks judicial review of the final decision by the Social Security Commissioner ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 USC §§ 401-433, and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 USC §§ 1381-1383f. This court has jurisdiction to review the Commissioner's decision pursuant to 42 USC § 405(g) and § 1383(c)(3). For the reasons set forth below, that decision should be affirmed.

1 - FINDINGS AND RECOMMENDATION

## ADMINISTRATIVE HISTORY

Munn protectively filed for DIB and SSI in May 2010, alleging a disability onset date of October 1, 1999.  Tr. 179-79.[1]  His applications were denied initially and on reconsideration.  Tr. 60-129.  On April 25, 2012, a hearing was held before Administrative Law Judge Richard A. Say ("ALJ") at which Munn, Sandra Bolton ("Bolton"), and a Vocational Expert ("VE") testified.  Tr. 36-59.  The ALJ issued a decision on May 25, 2012, finding Munn not disabled.  Tr. 23-31.  The Appeals Council denied a request for review on April 10, 2013.  Tr. 1-6.  Therefore, the ALJ's decision is the Commissioner's final decision subject to review by this court.  20 CFR §§ 404.981, 416.1481, 422.210.

## BACKGROUND

Born in October 28, 1964, Munn was 47 years old at the time of the hearing.  Tr. 39.  He has a GED, some college education, and past relevant work experience as a carpet cleaner.  Tr. 29, 39, 229-35.  Munn alleges that he is disabled based on anxiety, agoraphobia, attention deficit hyperactivity disorder ("ADHD"), and depression, and is unable to work longer than one month in temporary jobs because of increased anxiety in social settings.  Tr. 41, 199.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 USC § 423(d)(1)(A).  The ALJ engages in a five-step sequential

---

[1]  Citations are to the page(s) indicated in the official transcript of the record filed on November 26, 2013 (docket #13).

inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 CFR §§ 404.1520, 416.920; *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled. 20 CFR §§ 404.1520(a)(4)(i) & (b), 416.920(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement. 20 CFR §§ 404.1520(a)(4)(ii) & (c), 416.909, 416.920(a)(4)(ii) & (c). Absent a severe impairment, the claimant is not disabled. *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations. 20 CFR §§ 404.1520(a)(4)(iii) & (d), 416.920(a)(4)(iii) & (d); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments). If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments. 20 CFR §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 CFR § § 404.1520(a)(4)(iv) & (e), 416.920(a)(4)(iv) & (e). If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the

claimant can perform other work in the national economy.  *Bowen v. Yuckert*, 482 US 137, 142 (1987); *Tackett*, 180 F3d at 1099; 20 CFR §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g).

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F3d at 1098.  If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC.  *Id*.  If the Commissioner meets this burden, then the claimant is not disabled.  20 CFR §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g), 416.960(c).

## ALJ'S FINDINGS

At step one, the ALJ concluded that Munn has not engaged in substantial gainful activity since October 1, 1999, the alleged onset date. Tr. 25.  At step two, the ALJ determined that Munn has the severe impairments of organic mental disorder, alcohol abuse, substance addiction disorder, attention deficit hyperactivity disorder, and generalized anxiety disorder.  *Id*.  He found Munn's depression not to be a severe impairment because it was under good control with medication.  *Id.*  At step three, the ALJ concluded that Munn does not have an impairment or combination of impairments that meets or equals any of the listed impairments.  Tr. 25-26.  The ALJ found that Munn has the RFC to perform a full range of work at all exertional levels but mental limitations that limit him to "unskilled work with routine tasks requiring only superficial interaction with the public and co-workers." Tr. 26-27.

Based upon the testimony of the VE, the ALJ determined at step four that Munn's RFC precluded him from returning to his past job as a carpet cleaner, because it was skilled

work.  Tr. 29.  However, at step five, the ALJ found that Munn was not disabled because he could perform unskilled work as a warehouse worker, janitor, and a hand packer.  Tr. 30.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007).  This court must weigh the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998).  The reviewing court may not substitute its judgment for that of the Commissioner.  *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F3d 1194, 1205 (9th Cir 2008), citing *Parra v. Astrue*, 481 F3d 742, 746 (9th Cir 2007).  Where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "'supported by inferences reasonably drawn from the record.'"  *Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9th Cir 2008), *quoting Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004).

## MEDICAL RECORDS

Munn established care with Jeff Black, M.D., at the Salem Clinic on January 19, 2000, to discuss his depression and anxiety.  Tr. 326-27.  One week earlier, he had visited the emergency room ("ER") for "feelings of significant anxiety and slight panic."  Tr. 368-71.  These feelings had since decreased, but Munn suffered from similar symptoms "on and off since 'puberty'" and had been diagnosed with depression in 1996.  Tr. 327.  Earlier he had been diagnosed with ADHD for which he briefly had taken Ritalin.  Tr. 327, 368.  At the time of Dr. Black's examination, Munn was smoking two packs of cigarettes and drinking six or more beers a day.  Tr. 327.  He had recently reduced his caffeine intake by

reducing his coffee consumption from one pot to one cup a day.  *Id.*  Dr. Black assessed

Munn as suffering from depression with associated anxiety and a recent, mild panic attack,

and observed that he overused alcohol.  Tr. 326.  He started Munn on Wellbutrin and Xanax

and instructed him to reduce his drinking to two beers per day.  *Id.*

Two weeks later on January 31, 2000, Munn saw Dr. Black after another panic attack

sent him to the ER two days earlier.  Tr. 326, 367 (ER report).  Munn appeared "overtly

anxious" and reported feeling "anxious all of the time."  *Id.*  His drinking had increased to

12 beers per day.  Tr. 326.  The ER doctor administered Lorazepam which Munn preferred

to Xanax.  *Id.*  Dr. Black continued the Lorazepam, started Paxil, discontinued Wellbutrin

and Xanax, and told Munn to stop drinking.  *Id.*

At a follow-up appointment on February 2, 2000, Munn reported that he had been

"eaten up with anxiety," had taken 16 Lorazepam pills, and was planning to seek an

evaluation for alcohol rehabilitation the next day.  Tr. 325.  Dr. Black continued Paxil and

Lorazepam.  *Id.*

On February 21, 2000, Munn reported that Paxil decreased his anxiety symptoms,

and he had not experienced a panic attack recently.  Tr. 324.  After visiting the alcohol

rehabilitation center, he had started an outpatient program and was on a "weaning program."

*Id.*  Dr. Black prescribed Trazadone for sleep and increased the Paxil dosage.  *Id.*

On March 31, 2000, Munn was "tolerating the Paxil very well . . . and [was] no

longer having any of the anxiety like he had been, and no longer needing the Xanax type

medicines."  Tr. 323.  But after "falling off the wagon" since the last appointment, Munn

felt "shamed by his current alcohol abuse" and wished to try an inpatient program.  *Id.*

After four days in an alcohol rehabilitation center, Munn saw Dr. Black on April 25, 2000.  Tr. 330.  He had been attending Alcoholics Anonymous since leaving the facility and had an outpatient appointment the next day.  *Id*.  Paxil was still effectively reducing his anxiety.  *Id.*

Two years later on March 21, 2002,[2] Munn called the Marion County Health Clinic requesting anxiety medication.  Tr. 287-96.  He said that he was having suicidal thoughts, was drinking to relieve his tremors, and had been to rehab four times.  Tr. 288.  A nurse prescribed Prozac and Vistaril.  Tr. 298.

On September 11, 2003, Munn saw Timothy Zuk, M.D. at the Salem Clinic.  Tr. 331, 321.  Munn reported that he had quit alcohol for the past 48 hours after his consumption had increased to a case of beer a day.  Tr. 331.  He had stopped taking Prozac several weeks before because of sexual dysfunction which caused him to start drinking again.  Tr. 321.  Dr. Zuk assessed Munn as still withdrawing from alcohol and discussed other options for anxiety medication.  *Id.*

On January 8, 2004, Munn resumed treatment at the Salem Clinic with Dr. Zuk.  Tr. 332.  He was still depressed despite taking Prozac and reported becoming irritated and angry easily.  *Id.*  He was anxious at times and had trouble sleeping.  *Id.*  Munn had quit consuming alcohol in September 2003 after his last exam, was still abstinent, and was working at a temp agency.  Tr. 320.  Dr. Zuk discontinued Prozac and prescribed Lexapro for his depression and anxiety.  *Id*.

---

[2] There are no medical records dated from April 25, 2000, to March 21, 2002.

On January 21, 2004, Munn reported that Lexapro had improved his depression, but he slept only five hours at night. Tr. 320. Dr. Zuk continued Lexapro and prescribed Desyrel to help Munn sleep. Tr. 333.

At a follow-up appointment on February 4, 2004, Munn reported that he was sleeping "well" because of the Desyrel, his mood "ha[d] been excellent, a 9-10 out of 10," and he was still sober. Tr. 319. Munn was employed and "being paid well." *Id.*

However, on September 14, 2004, Munn went to the ER for tremors. Tr. 350. At the time, he was homeless and drinking alcohol. *Id.*

Munn sought treatment again from Dr. Zuk on November 17, 2004. Tr. 334. He reported that the Lexapro had helped "some," but he "had incomplete control of his symptoms." *Id.* He was sleeping "fairly well" and was in an alcohol withdrawal program. *Id.* Dr. Zuk increased the Lexapro dosage. *Id.*

On January 12, 2005, Dr. Zuk assessed Munn with continuing post-alcohol withdrawal symptoms, as well as some anxiety and chronic insomnia. Tr. 318. Munn reported that he had been sober for 90 days and felt "anxious, some jitteriness, and some clumsiness." *Id.* Dr. Zuk resumed Desyrel and continued Lexapro. *Id.*

Four months later on May 19, 2005, Munn reported no anxiety and an "overall mood [of] 8-9/10." Tr. 317. He was attending community college and had been abstinent from alcohol for eight months. *Id.* However, his sleeping schedule was irregular. Dr. Zuk advised Munn to start an aerobic exercise program and ordered comprehensive tests to rule out a metabolic origin of his fatigue. *Id.*

On June 29, 2005, Munn reported his mood had been "fair." Tr. 336. He had been sober for nine months. *Id.* He was sleeping five hours at night and, as a result, "[wa]s very

tired and lethargic throughout the entire day." *Id.* Dr. Zuk discontinued Desyrel because it made Munn feel sick and prescribed Amitriptyline for insomnia. Tr. 336. Munn had not begun exercising as prescribed. *Id.* The metabolic studies were normal. *Id.*

Dr. Zuk examined Munn again on October 20, 2005, regarding his insomnia and depression. Tr. 316. In general, Munn was "doing quite well," had "been off alcohol now for a year," was taking "visual communication" classes at a community college, and reported that "his mood [was] a five on a scale of one to ten." *Id.* Munn still suffered from insomnia but had not begun taking Amitriptyline. *Id.*

In February 2006, after one year of sobriety, Munn's alcohol use relapsed. Tr. 315. After completing detoxification in an inpatient facility on February 25, 2006, he entered a clean and sober residence. *Id.* On March 20, 2006, Dr. Zak assessed Munn's alcohol abuse as in remission. *Id.* Munn had started the Amitriptyline as prescribed, had continued taking his medications through the relapse, and reported good control of his mood. *Id.* On April 18, 2006, Dr. Zak noted that Munn's mood was under "good control" with Lexapro and that he was sleeping well with Amitriptyline. *Id.*

On June 26, 2006, Munn sought treatment for his insomnia. Tr. 314. Amitriptyline caused him increasing daytime anxiety and restless legs at night. *Id.* He was still living in the rehabilitation facility and drinking a half pot of coffee a day before noon. *Id.* Dr. Zuk observed that Munn did not appear to be "clinically depressed." *Id.* He continued Lexapro, started Trazodone for insomnia, and instructed Munn to increase Trazodone "by 50 mg every couple of nights until he is sleeping." *Id.*

9 - FINDINGS AND RECOMMENDATION

On September 18, 2006, Munn told Dr. Zuk that "his mood is already improving on Lexapro 20 mg a day" and that "he was having a full night's rest with the titration of [T]razodone to 200 mg at night."  Tr. 313.

Three months later, on December 8, 2006, Munn reported sleeping "fairly well" when using 200-400 mg of Trazodone, and believed the Lexapro continued to work well because his anxiety was 3-4 on a scale of 1-10.  Tr. 311.

On February 2, 2007, Munn sought treatment regarding his nicotine dependence and depression.  Tr. 310.  He had been abstinent from alcohol for one year, reported his mood had been "excellent" on Lexapro, and was sleeping well on 50 mg of Trazodone.  *Id.* Dr. Zuk prescribed Nicoderm and noted that Munn's anxiety symptoms were under "good control."  *Id.*  On March 28, 2007, Munn reported that he had increased the Trazodone to 100 mg a night.  Tr. 342.  He was exhibiting nicotine withdrawal symptoms but did not smell like cigarettes.  *Id.*

On December 24, 2007, Munn reported being abstinent for one week after another relapse in alcohol use, but was still exhibiting tremors from withdrawal.  Tr. 343.  Dr. Zuk instructed Munn to continue taking Lexapro and Trazodone.  *Id.*

At the follow-up examination on February 7, 2008, Munn complained about his continued fatigue despite getting six to eight hours of sleep a night with Trazodone. Tr. 344.  Blood tests during his previous appointment had revealed Munn was anemic (blood with low red blood cell count).  *Id.*  He reported feeling anxious, but not depressed, and had trouble concentrating.  *Id.*  Munn believed that his childhood diagnosis of ADHD contributed to his difficulty in maintaining jobs.  *Id.*  His daily routine consisted of eight to ten cups of coffee and a few hours of walking.  *Id.*  Dr. Zuk opined that the etiology of

Munn's fatigue was unclear and "could be incompletely treated depression, anxiety, or ADHD." *Id.* He recommended evaluation by a mental health provider and would consider prescribing Wellbutrin in the future. *Id.*

Munn complained about his fatigue again on June 3, 2008. Tr. 307. His overall mood was 5-6 on a scale of 1-10, and he was sleeping six to eight hours per night with the aid of 300 mg (the maximum prescribed dose) of Trazodone. *Id.* Dr. Zuk prescribed 150 mg of Wellbutrin. *Id.*

By July 18, 2008, Munn had stopped using the Wellbutrin because of side effects. Tr. 306. He discussed his ADHD in more detail. *Id.* Munn again reported ongoing "distractibility during the day," but his mood symptoms were "under good control with current antidepressants," and he was sleeping well. *Id.* Dr. Zuk decided to treat the ADHD with a 40 mg empiric trial of Strattera. *Id.*

Dr. Zuk referred Munn for an evaluation of his ADHD. Tr. 420-25. During intake on September 11, 2008, Munn explained his history of anxiety as "constantly worr[ying] about things and . . . never able to relax." Tr. 424. Lynn McDowell, M.S., noted that it "is not uncommon for individuals suffering from ADHD to develop generalized anxiety disorder as a way to compensate." *Id.*

On September 19, 2008, Joel Suckow, M.D., evaluated Munn's psychiatric symptoms. Tr. 417-19. Munn reported that he had needed special assistance to complete school and was "chronically impaired by having a difficult time following verbal instructions as well as completing tasks" in previous jobs. Tr. 417. "He also finds he will start projects and he won't feel inclined to finish them." *Id.* Munn "denie[d] depression" but "because of his ADHD, there [were] times he will feel anxious." *Id.* He said that he

11 - FINDINGS AND RECOMMENDATION

was trying to find a job.  *Id.*  Based on Munn's described symptoms, Dr. Suckow diagnosed "at least a degree of ADHD" that "could likely benefit from medication management" and "generalized anxiety" that could be attendant to the caffeine intake or ADHD.  Tr. 418.  He was "reluctant to start a stimulant" because he had only been sober for ten days.  *Id.*  Based on Dr. Zuk's prescription of Lexapro, Dr. Suckow opined that Munn experienced more depression than revealed during the evaluation.  *Id.*  He prescribed Desipramine, a non-stimulant, and recommended that Munn continue with a therapist until his follow-up. Tr. 418-19.

On November 5, 2008, Munn reported to his therapist that he had been released from a detoxification program five days earlier.  Tr. 414.  Munn had not begun taking the Desipramine but was committed to attending Alcoholics Anonymous and complying with the medication plan.  *Id.*  Five days later, on November 10, 2008, Munn met with another therapist.  Tr. 413.  They discussed Munn reading books on ADHD and developing strategies to manage his condition daily.  *Id.*

On December 3, 2008, Munn reported to Dr. Suckow that he was not tolerating Desipramine because it caused blurred vision and disrupted his photography.  Tr. 410. Dr. Suckow noted Munn's "day-to-day symptoms" as:

> [m]ainly feelings of anxiety intermixed with periods where his mood will be low/depressed, which is characterized by no energy, anhedonia [inability to experience pleasure], sleeping, and low appetite.  He does endorse symptoms consistent with ADHD, but did not identify these as his "core" symptoms (i.e., the symptoms that are most bothersome/disruptive on a daily basis, and that lead him to self-medicate the anxiety with [alcohol].

*Id.*

Munn reported that Lexapro was "very helpful" when he was sober and that he would like to return to work. *Id.* Dr. Suckow opined that alcohol:

> continues to be a complicating factor. If he relapses again, would consider inpatient [treatment]. In terms of meds, based on his history . . . , I think it is most important to address the symptoms he describes of anxiety and depression. . . . Once he is able to maintain a period of sobriety, as well as a therapeutic response to treatment of these symptoms, we will revisit and address residual ADHD symptoms as indicated.

*Id.*

Dr. Suckow increased the Lexapro with stimulants for ADHD as a future option. Tr. 410-11.

On January 6, 2009, Munn reported seeing a counselor weekly and actively seeking employment. Tr. 409. Dr. Suckow reiterated that despite the strong recommendation from Munn's previous therapist, Munn did "not appear to have ADHD, or if he [did] it is mild and well-controlled with current medication." *Id.* Munn's depression and alcohol abuse remained his "chief complaints" and were both "adequately addressed." *Id.* Because Munn experienced improvement in his anxiety with an increase of Lexapro from 20 to 30 mg, Dr. Suckow increased the dosage to 40 mg, while noting that he was "not sure how much this will help with what [Munn] calls his 'train of thought.'" *Id.*

At the next appointment on March 6, 2009, the increased dosage appeared to be working. Tr. 408. Munn reported a "big difference" in his anxiety and ability to focus. *Id.* Dr. Suckow noted that Munn was four months into sobriety and still at risk of relapse. *Id.* Again, on June 19, 2009, Munn reported that the medications were effective. Tr. 405.

One year later, on July 24, 2010, the Department of Human Services referred Munn to Robert A. Kruger, Psy.D., for a consultative evaluation. Tr. 428-32. He had stopped

13 - FINDINGS AND RECOMMENDATION

seeing Dr. Suckow or a therapist "because [he] wasn't getting anything out of the sessions."
Tr. 429.  He was still taking Trazodone but stopped Lexapro one month earlier because it
"wasn't doing anything" for him.  *Id.*

Munn reported to Dr. Kruger that he had been sober for two years and worked
various jobs through a temporary placement agency.[3]  Tr. 428-30.  He described his typical
day as awaking around 7:00 and spending "much of [his] morning . . . going to medical
appointments with [his] girlfriend."  Tr. 429.  In the afternoon, "he hangs out, watches
television, occasionally goes for a walk, and usually goes to his parents' residence to visit
around 2:00, and may go for a drive. . . .  '[He's] really into photography.  [He] go[es] out
and takes pictures.'"  *Id.*  In the evenings, he will "go for a walk, watch TV, and just hang
out."  *Id.*  He goes to bed around 11:00 pm and has a good sleep pattern.  *Id.*  On the
weekends, he watches TV and goes on drives or to the store with his girlfriend.  *Id.*  Munn
has two good friends with whom he visits and talks "a lot."  *Id.*  He described himself as:
"For the most part easygoing and pretty gregarious.  I've always had a lot of friends."
Tr. 431.

Dr. Kruger found that Munn was able to negotiate the community by car "adequately
and independently."  Tr. 430.  Munn admitted that he still got anxious "because of the
thoughts I think.  I give myself these guilt trips about my parents, from the past."  *Id.*  His
most significant problem was his "total lack of motivation.  A lot of it is fear — fear of
failure, fear of success."  Tr. 431.  Without conducting any formal psychometric tests,

---

[3] While Munn had no earnings in 2009-2011, his gross earnings totaled $1,625.21 in 2006, $2,152.50 in 2007,
and $340.00 in 2008.  Tr. 191-92.

14 - FINDINGS AND RECOMMENDATION

Dr. Kruger noted that "Munn did not demonstrate, nor did he report any psychiatric symptomatology reflective of a psychotic, depressive, or anxiety disorder." Tr. 432.

On October 13, 2010, Munn resumed treatment with Dr. Zuk. Tr. 457. He still was not taking the Lexapro, but intended to see a mental health specialist soon. *Id.* Munn also denied symptoms of sleep disturbance. *Id.*

The next day, Jane Silbernagel, L.C.S.W., completed a Mental Impairment Questionnaire. Tr. 437-44. She listed Munn's impairments as 300.21 (Panic disorder with agoraphobia) and 296.31 (Major Depressive Disorder).[4] Tr. 437. Munn's reported symptoms were "panic attacks when in public, [or] in any sort of interpersonal conflict or slight confrontation." Tr. 439. Munn reportedly managed his symptoms by avoiding certain locations with a lot of people and leaves "as soon as possible." *Id.* At the time, he was taking Celexa. *Id.* Silbernagel described Munn's ability to complete an eight-hour work day as "poor" due to his fatigue from anxiety. Tr. 440. She opined that Munn would need to be absent from work more than four times a month. Tr. 441.

Munn returned to Dr. Zuk on November 17, 2010, because he wanted to try medications again after a "relapse of anxiety and agoraphobia." Tr. 455. Dr. Zuk prescribed 20 mg of Celexa and continued Trazodone. Tr. 455-56.

On January 13, 2011, Munn reported "some persistent anxiety and agoraphobia but less than they were." Tr. 453. Dr. Zuk increased the Lexapro. *Id.* One month later, Dr. Zuk assessed that Munn was responding to the increase in medication, although he was experiencing a slight loss in libido as a side effect. Tr. 451. On March 29, 2011, Munn

---

[4] The Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) assigns numbers and organizes each psychiatric diagnosis into five levels relating to different aspects of the disorder or disability. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 27-33 (5th ed., text rev. 2013).

reported the medication was controlling his mood and anxiety "very well" with no side effects.  Tr. 449.

As of October 20, 2011, the last examination in the record, Munn's status was unchanged.  He had been sober since November 2008, was taking Trazodone for insomnia, getting six to eight hours of sleep but feeling groggy in the morning, and controlling his anxiety with Celexa and no side effects.  Tr. 447.

## FINDINGS

Munn claims that the ALJ erred by:  (1) failing to classify agoraphobia as a severe impairment at step two; (2) discrediting his testimony; (3) discrediting Bolton's testimony; and (4) formulating the RFC without including the limitations associated with agoraphobia.

## I.    Step Two

### A.    Agoraphobia

Munn contends that the ALJ erred at step two by failing to consider or address his diagnosis of agoraphobia as a separate impairment.  The Commissioner responds that even if Munn suffered from agoraphobia, that disorder is encompassed by the ALJ's finding that he has the severe impairment of a "generalized anxiety disorder."

The medical opinions cited by Munn do not contain a diagnosis of agoraphobia. Instead, the references in the record to agoraphobia are, at best, superficial and based entirely on Munn's own description of his symptoms.  One reference is found in Silbernagel's Mental Impairment Questionnaire which lists Munn as suffering from DSM-IV 300.21 (Agoraphobia with Panic Attacks).[5]  That diagnosis is based solely on Munn's

---

[5] These listing is found in the DSM-IV which separated agoraphobia into two listings: 300.21 (Agoraphobia with Panic Attacks) and 300.22 (Panic Disorder *without* Agoraphobia).  AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 218 (4th ed., text rev., 2000) ("DSM-IV").  The most recent edition, DSM-V, diagnoses

account of having panic attacks in public spaces and his avoidance of crowded locations.
Tr. 439. Another reference is found in Dr. Zuk's records dated November 17, 2010, and
January 31, 2011. Tr. 453-55. Dr. Zuk never diagnosed Munn with agoraphobia, but
simply recorded Munn's use of that word to describe his symptoms when asking to go back
on his anxiety medication because of a "relapse of anxiety and agoraphobia." Tr. 453-55.
Dr. Zuk never solicited an explanation from Munn about his symptoms. *Id.* After January
31, 2011, neither Munn nor Dr. Zuk mentioned agoraphobia again. Munn's evaluations by
Drs. Suckow and Kruger are the only psychological assessments in the record, and neither
evaluator diagnosed agoraphobia or any other social phobia. Tr. 428-32 (Dr. Kruger), 417-
419 (Dr. Suckow). Thus, no objective medical evidence supports the conclusion that Munn
suffers from agoraphobia.

      Despite the absence of such evidence in the record, Munn argues that agoraphobia is
a new explanation for his past symptoms and urges the court to consider his longitudinal
history. However, Munn's past complaints to Dr. Zuk and others, notwithstanding the few
mentioned above, did not convey symptoms of agoraphobia. The current DSM-V defines
agoraphobia as:

> A.     Marked fear or anxiety about two (or more) of the following five
> situations:
>     1. Using public transportation (e.g., automobiles, buses, trains, ships,
> planes).
>     2. Being in open spaces (e.g., parking lots, marketplaces, bridges).
>     3. Being in enclosed places (e.g. shops, theaters, cinemas).
>     4. Standing in line or being in a crowd.
>     5. Being outside of the home alone.

---

Agoraphobia 300.22, "irrespective of the presence of panic disorder." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND
STATISTICAL MANUAL OF MENTAL DISORDERS 218 (5th ed., text rev., 2013) ("DSM-V").

B.  The individual fears or avoids these situations because of thoughts
that escape might be difficult or help might not be available in the
event of developing panic-like symptoms or other incapacitating or
embarrassing symptoms . . .
C.  The agoraphobic situations *almost always provoke* fear or anxiety.
D.  The agoraphobic situations are actively avoided, require the
presence of a companion, or are endured with *intense* fear or anxiety.
E.  The fear or anxiety is out of proportion to the actual danger posed
by the agoraphobic situations and to the sociocultural context.
F.  The fear, anxiety, or avoidance is persistent, typically lasting for 6
months or more.
G.  The fear, anxiety, or avoidance causes clinically significant
distress or impairment in social, occupational, or other important areas
of functioning.
. . . .
I.  The fear, anxiety, or avoidance is not better explained by the
symptoms of another mental disorder . . . .

DSM-V at 217-18 (emphasis added).

Munn's earlier complaints generally did not indicate a fear of being in public or leaving his home by himself and identified anxiety triggers other than those listed as agoraphobia criteria.  This pattern is most noticeable in his mental health evaluations.  In his evaluation with Dr. Suckow, Munn attributed his anxiety to his ADHD.  Tr. 417.  More recently, on July 24, 2010, Munn explained to Dr. Kruger that memories from the past provoked his anxiety.  Tr. 430 ("Sometimes I get anxiety because of the thoughts I think.  I give myself these guilt trips about my parents, from the past.").  Munn also explained that he feared failure, and even success.  *Id.*  During treatment with Silbernagel, Munn explained that confrontation and interpersonal conflicts also caused him anxiety.  Tr. 439.

Instead of specifically listing agoraphobia, the ALJ found that Munn suffered from the severe impairment of a "generalized anxiety disorder."  Tr. 25-26.  The DSM-V lists agoraphobia (300.22) and generalized anxiety disorder (300.02)[6] as distinct disorders.  Both

_____

[6]  A.  Excessive anxiety and worry (apprehensive expectation), occurring more days than not for at least 6 months, about

require a finding that the symptoms are not better defined by another mental disorder.
DSM-IV at 218, 222.  Overall, Munn's symptoms are broader than a fear of going outside
his home and align better with a generalized anxiety disorder.  Although he sometimes
experiences anxiety associated with leaving the house and crowds, his predominant
symptoms are persistent fatigue (Tr. 307, 336, 344), and sleep disturbance (Tr. 320, 317-18,
332), both of which are symptoms of a generalized anxiety disorder.  Dr. Zuk opined that
Munn's fatigue was caused by his anxiety.  Tr. 344.  Munn also complained of having
difficulty concentrating (Tr. 417), another symptom of a generalized anxiety disorder, and
although he attributed it to ADHD, Dr. Suckow found he did not have ADHD.  Tr. 409.

   Moreover, there is no evidence that the agoraphobic situations "almost always
provoke fear or anxiety" or that he endures them with "intense fear or anxiety" as required
by agoraphobia.  His description of his daily routine of going on walks, taking photographs
outside, and visiting his parents, gives no indication that he held a constant fear of leaving
the house.  Tr. 429.

   Instead, the record paints a picture of an anxiety disorder that sometimes included
social anxiety.  Dr. Zuk did not treat Munn's reported agoraphobia as a change in his

---

a number of events or activities (such as work or school performance).
  B.  The individual finds it difficult to control the worry.
  C.  The anxiety and worry are associated with three (or more) of the following six symptoms (with at least some
symptoms having been present for more days than not for the past 6 months):
  . . . .
        1.  Restlessness or feeling keyed up or on the edge.
        2.  Being easily fatigued.
        3.  Difficulty concentrating or mind going blank.
        4.  Irritability.
        5.  Muscle tension.
        6.  Sleep disturbance (difficulty falling asleep or staying asleep, or restless, unsatisfying sleep).
  D.  The anxiety, worry, or physical symptoms cause clinically significant distress or impairment in social,
occupational, or other important areas of functioning.
  E.  The disturbance is not attributable to the psychological effects of a substance . . . or another medical condition . . . .
  F.  The disturbance is not better explained by another mental disorder . . . .
DSM-V at 222.

condition, but instead considered it to be part of his previously diagnosed anxiety disorder. Accordingly, Dr. Zuk treated Munn's complaints of anxiety as he had since 2003 and prescribed Celexa for Munn's depression, anxiety, and agoraphobic symptoms. Afterwards, Munn repeatedly reported that the prescribed dose of 20 mg, and later 40 mg, of Celexa was controlling his anxiety. Tr. 447-52.

Munn also argues that the ALJ neglected the duty to develop the record associated with Munn's emerging agoraphobia. "In Social Security cases the ALJ has a special duty to fully and fairly develop the record." *Smolen v. Chater*, 80 F3d 1273, 1288 (9th Cir 1996) (citation omitted). "Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to 'conduct an appropriate inquiry.'" *Tonapetyan v. Halter*, 242 F3d 1144, 1150 (9th Cir 2001), quoting *Smolen*, 80 F3d at 1288 (additional citation omitted). "The ALJ may discharge this duty in several ways, including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." *Id* (citations omitted).

There was no need to develop the record further because it contains no ambiguity about Munn's limitations. The ALJ accounted for any social anxiety that Munn may experience, whether caused by agoraphobia or a generalized anxiety disorder. In the Social Security Administration's regulations, agoraphobia is evaluated with other anxiety-related disorders under Listing 12.06.[7] "The paragraph C criterion of 12.06 reflects the uniqueness

---

[7] 12.06 Anxiety Related Disorders: In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

of agoraphobia, an anxiety disorder manifested by an overwhelming fear of leaving the home." 20 CFR Pt. 404, Subpt. P, App. 1, at 12.00(F). Paragraph C, or evidence of the "complete inability to function independently outside the area of one's home," is an alternative to paragraph B. Thus, a claimant can meet the Listing 12.06 criteria if his anxiety disorder causes *either* the complete inability to function independently outside the home (paragraph C), or at least two marked limitations or repeated episodes of decompensation (paragraph B). *Id.* The ALJ considered Munn's limitations under both paragraphs. Tr. 26. Most importantly, the ALJ found Munn could function independently outside his home, relying on evidence that Munn "visits his parents daily and does photography." *Id.* The ALJ also acknowledged Munn's anxiety in public spaces to be offset by his easy going nature, numerous friends, and pleasant demeanor shown during his evaluation with Dr. Kruger. *Id.*

---

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

  A. Medically documented findings of at least one of the following:
     1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
        a. Motor tension; or
        b. Autonomic hyperactivity; or
        c. Apprehensive expectation; or
        d. Vigilance and scanning;
or
     2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
     3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
     4. Recurrent obsessions or compulsions which are a source of marked distress; or
     5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;
AND
  B. Resulting in at least two of the following:
     1. Marked restriction of activities of daily living; or
     2. Marked difficulties in maintaining social functioning; or
     3. Marked difficulties in maintaining concentration, persistence, or pace; or
     4. Repeated episodes of decompensation, each of extended duration.
OR
  C. Resulting in complete inability to function independently outside the area of one's home.

21 - FINDINGS AND RECOMMENDATION

Unlike cases in which a late diagnosis implies additional restrictions, the ALJ considered the effects of agoraphobia in the analysis of Munn's generalized anxiety disorder. Accordingly, the RFC restricted Munn's social interaction to only superficial interaction with public and co-workers. Tr. 27. As a result, the ALJ did not err at step two.

**B.    Organic Mental Disorder**

Munn also assigns error to the ALJ's contradictory treatment of his depression in step two. On the one hand, the ALJ listed an "organic mental disorder" as a severe impairment, but, on the other hand, stated that Munn's "depression is under good control with medication . . . [and] is not a severe impairment but is considered in assessing his residual functional capacity." Tr. 25. The Commissioner contends that the ALJ's reference to an "organic mental disorder" is simply a harmless scrivener's error because the record contains no evidence that Munn suffered from an organic mental disorder.

Depression and depressive disorders are distinct from organic mental disorders. Organic mental disorders are "[p]sychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities." 20 CFR Pt. 404, Subpt. P, App. 1, 12.02. Depression must be evaluated under Listing 12.04, separate from organic mental disorders evaluated under Listing 12.02. Given this distinction, the ALJ's listing of an organic mental disorder could not be attributable to Munn's history of depression.

Even if it were, the ALJ's conclusion that the depression was not severe and controlled by medication is supported by the record. Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for

disability benefits. *See, e.g.*, *Brown v. Barnhart*, 390 F3d 535, 540 (8th Cir 2004) (citation

omitted); *Lovelace v. Bowen*, 813 F2d 55, 59 (5th Cir 1987); *see also Odle v. Heckler*, 707

F2d 439, 440 (9th Cir 1983) (affirming a denial of benefits and noting that the claimant's

impairments were responsive to medication).

Thus, any error in mistakenly including an organic mental disorder at step two was

harmless.

## II.    Therapist Silbernagel's Opinion

Munn contends the ALJ erred in rejecting Silbernagel's opinion that Munn suffers

from agoraphobia and associated limitations of reduced stamina, work pace, and the need

for non-scheduled breaks and numerous days off.  The ALJ gave Silbernagel's opinion

"little weight" based on the lack of objective findings to support it and on Munn's

inconsistent daily activities.  Tr. 29.

As a social worker, Silbernagel is not considered an "acceptable medical source"

under the regulations." *Turner v. Comm'r of Soc. Sec.*, 613 F3d 1217, 1224 (9th Cir 2010).  The

regulations treat therapists as "other sources."  20 CFR § 404.1513(d)(1), § 416.913(d)(1).

An ALJ may expressly disregard testimony of "other sources" if the ALJ "gives reasons

germane to each witness." *Turner*, 613 F3d at 1224.

The ALJ's first reason for discounting Silbernagel's opinion is germane.  As the ALJ

correctly stated, Silbernagel's opinion of Munn's limitations was based entirely on his "self-

report of symptoms," rather than on objective findings.  Tr. 29.  The record does not show

that Silbernagel had sufficient contact with Munn to provide a reliable opinion. *See Crane*

*v. Shalala*, 76 F3d 251, 254 (9th Cir 1996) (affirming ALJ's rejection of therapist's testimony in

part due to the length of the treating relationship).  The length of Munn's treating relationship

23 - FINDINGS AND RECOMMENDATION

with Silbernagel is unclear because her completed questionnaire is the only record of her treatment.  On the questionnaire, she states that she treated Munn about "twice a month one hour each time."  Tr. 437.  The start date on the questionnaire is illegible, but appears to be September 28, 2010, which is consistent with Dr. Zuk's October 31, 2010 note that Munn would be seeing a mental health specialist soon.  Tr. 457.  Most likely, Silbernagel had only been treating Munn for a month (two visits at the most) before completing the questionnaire.

The ALJ's second reason to reject Silbernagel's opinion also is germane. Specifically, the ALJ found that her report of Munn's debilitating panic attacks was contradicted by evidence that Munn attended college, worked periodically, and regularly visited neighbors and the coffee shop.  Tr. 29.  That inconsistency is supported by the record.  Munn only reported having panic attacks in early January 2000 (Tr. 326, 367) and again on January 31, 2000 (Tr. 326), and reported no further panic attacks to any medical provider.  Although some social settings may cause Munn anxiety, his fear has not completely prevented him from social interaction.  For instance, although he testified that sometimes he has "mild" panic attacks while driving, he sought renewal of his driving privileges on two separate occasions following relapse (Tr. 304, 307), occasionally drives for pleasure (Tr. 429), and continues to drive.  Tr. 44-45.  Also, he has worked temporary jobs or day labor occasionally (Tr. 40-41, 428-30), taken college courses (Tr. 316-317), walks outside for pleasure (Tr. 429), and has always had lots of friends.  Tr. 431.

Thus, the ALJ provided germane reasons to discredit Silbernagel's opinion.

///

///

///

24 - FINDINGS AND RECOMMENDATION

III.   **Munn's Credibility**

A.   **Legal Standards**

The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir 1995), citing *Bunnell v. Sullivan*, 947 F2d 341, 345-46 (9th Cir 1991) (*en banc*).  A general assertion that the plaintiff is not credible is insufficient; the ALJ "must state which [subjective symptom] testimony is not credible and what evidence suggests the complaints are not credible."  *Dodrill v. Shalala*, 12 F3d 915, 918 (9th Cir 1993).  The ALJ may additionally employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms by the claimant. *Id.*

The ALJ must consider all symptoms and pain which "can be reasonably accepted as consistent with the objective medical evidence and other evidence."  20 CFR § 404.1529(a). Once a claimant shows an underlying impairment which may "reasonably be expected to produce pain or other symptoms alleged," absent affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for finding a claimant not credible. *Lingenfelter*, 504 F3d at 1036, citing *Smolen*, 80 F3d at 1281.  This standard "is the most demanding required in Social Security cases."  *Moore v. Comm'r of the Soc. Sec. Admin.*, 278 F3d 920, 924 (9th Cir 2002).

Examples of clear and convincing reasons include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistent statements, daily activities inconsistent with the alleged symptoms, a sparse work history, or testimony that is vague or less than candid.  *Tommasetti*, 533 F3d at 1040.

Credibility determinations are within the province of the ALJ.  *Fair v. Bowen*, 885

F2d 597, 604 (9th Cir 1989), citing *Russell v. Bowen*, 856 F2d 81, 83 (9th Cir 1988).  Where

the ALJ has made specific findings justifying a decision to disbelieve an allegation of

excess pain, and those findings are supported by substantial evidence in the record, the role

of the reviewing court is not to second-guess that decision.  *Id.*

**B.    Testimony**

Munn testified that his anxiety history predates and contributed to his alcohol abuse.

Tr. 43 ("I've recently come to know that, that instead of it being depression, it's anxiety.").

*Id.*  At the time of the hearing, he had been sober for four years, after ten years of drinking.

*Id.*  Although taking anxiety medication in compliance with the prescription, he often

forgets to take it.  Tr. 44.

Munn's last permanent job was at a carpet cleaning business in 1997.  Tr. 42.  He has

since worked at temporary jobs for no longer than a month at a time.  Tr. 40-41.  Most jobs

ended because he quit or stopped showing up due to difficulty tolerating "office politics . . .

or the backstabbing . . . or all the sort of rhetoric that goes on . . . it just gets to [him] and

messes with [him]."  Tr. 41.  During one job, for instance, Munn was not pleased how the

manager handled an office personnel issue and quit.  *Id.*  He admitted that he "just ha[s] a

hard time trying to deal with" the social aspects of the workplace.  Tr. 42.  Many days he

awakes with the intention of going to work but finds himself "getting so depressed and

wondering why [he is] even going to work that [he will] call in, and that gets [him] in

trouble."  *Id.*

His typical day begins with three hours of preparing to leave the house.  Tr. 45.

"Then [he] tr[ies] to figure out what [he's] supposed to do that day, whether somebody's

wanting me to do something or not." *Id.*  For instance, he may help his mother weed her garden, or drive to buy gasoline, or "any of the daily things you got to do to, to survive." *Id.*  Otherwise, he "just let[s] the day happen the way it is supposed to." *Id.*  Sometimes he shops for groceries but other times cannot leave the house.  Tr. 44.  He has a driver's license but can get very angry with other drivers on the road.  Tr. 44.  He has panic attacks "to a certain degree" in traffic and has to stop or remain at the destination for a long time until he can calm down.  Tr. 48-49.

At home, he "can sit in front of a TV for a little while but not for very long."  Tr. 45-46.  He is easily distracted and will turn off the TV if he cannot find a good show or if the number of commercials makes him anxious.  Tr. 46-47.  Only smoking cigarettes keeps his attention.  Tr. 47.  He takes naps every day because he is tired or because he "wants to check out."  Tr. 49.  He gets along with other people "as long as [he's] able to meet them on [his] own terms."  *Id.*

C.    **Analysis**

With no evidence of malingering, the ALJ was required to provide clear and convincing reasons for rejecting Munn's testimony.  The ALJ rejected Munn's testimony: (1) about his ADHD based on his past employment in skilled labor and contrary medical evidence; (2) about the severity of his anxiety and insomnia based on evidence that medication effectively controlled symptoms; and (3) about the extent of his social fears based on his life activities.  Tr. 27-28.  All of the given reasons are clear and convincing.

First, Munn's childhood diagnosis of ADHD has not limited his functioning in the ways he claims.  He reported to treatment providers that he suffered from ADHD since childhood.  Tr. 344.  Therefore, evidence that he performed skilled work as a carpet cleaner

earlier in his life is a clear and convincing reason for discrediting his testimony that he cannot focus on anything except smoking cigarettes.

Second, the severity of Munn's ADHD symptoms is contradicted by his psychological assessments. Dr. Suckow originally diagnosed Munn with "at least a degree of ADHD." Tr. 418. Although Munn continued to describe ADHD symptoms during his treatment with Dr. Suckow, his ADHD symptoms were not his primary complaints. Tr. 410. As cited by the ALJ, Dr. Suckow concluded on January 6, 2009, that Munn "does not appear to have ADHD, or if he does it is mild and well-controlled with current medication." Tr. 409. Additionally, on March 6, 2009, Munn reported that the increased dosage of Lexapro made a "big difference" in his ability to focus. Tr. 408.

Third, evidence that he regularly leaves his house for activities is a clear and convincing reason for rejecting Munn's testimony about his social functioning. He testified that he has trouble leaving the house in the morning, but he has successfully looked for work (Tr. 431), worked temporary jobs (Tr. 40-41, 428-30), and completed college courses (Tr. 316-17, 428), all of which presume regular attendance. "[T]he ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting." *Molina v. Astrue*, 674 F3d 1104, 1113 (9th Cir 2012). Evidence that he visits his mother or gets coffee in the afternoons is a less convincing reason because it is consistent with his testimony that he usually stays at home in the morning preparing to leave home before he ventures outside in the afternoon. But any error the ALJ made in relying on these afternoon activities to contradict Munn's testimony does not negate the validity of the ALJ's ultimate conclusion.

This is especially true in light of the ALJ's strongest reason given for Munn's lack of credibility, namely effectiveness of his medication.  *See Batson*, 359 F3d at 1197.  The record is replete with evidence that medication effectively treated Munn's anxiety, depression, and insomnia.  In fact, the majority of such evidence involves Munn reporting improved symptoms to his physicians.  Tr. 330, 405, 409, 447, 449, 451.  Although Munn discontinued some medications due to side effects (Wellbutrin, Xanax (Tr. 326), Prozac (Tr. 332), and Amitriptyline (Tr. 324)), his most recent prescriptions for Celexa and Trazadone are effective without causing side effects.  Tr. 447.  Even Silbernagel opined that Munn had a "good prognosis for some symptom reduction."  Tr. 440.

Based on the Munn's past accomplishments, Dr. Suckow's opinion, and the treatment record, substantial evidence in the record supports the ALJ's credibility findings as to Munn's testimony.

## IV.    Lay Testimony

### A.    Legal Standards

To reject lay witness testimony, the ALJ "must give reasons that are germane to each witness."  *Molina*, 674 F3d at 1114, citing *Dodrill*, 12 F3d at 919.  Under Ninth Circuit law, the ALJ may not "discredit . . . lay testimony as not supported by medical evidence in the record."  *Bruce v. Astrue*, 557 F3d 1113, 1116 (9th Cir 2009), citing *Smolen*, 80 F3d at 1289 ("The rejection of the testimony of [the claimant's] family members because [the claimant's] medical records did not corroborate her fatigue and pain violates SSR 88-13, which directs the ALJ to consider the testimony of lay witnesses where the claimant's alleged symptoms are *unsupported* by her medical records."  (alteration in original)).

///

29 - FINDINGS AND RECOMMENDATION

### B.    Bolton's Testimony

Bolton testified at the hearing (Tr. 51-59) and through a written statement.  Tr. 219-26.  At the time of the hearing, she had known Munn for 21 years, and they had been living together for four years.  Tr. 51-52.  According to Bolton, Munn has to be alone for a couple of hours in the morning because he's very anti-social "even with [her]."  Tr. 52.  After having coffee with his mother in the afternoons a couple times a week, he goes home and takes a two to three hour nap.  Tr. 52, 55.  Anytime Munn leaves the house other than to have coffee, even to get the mail, he gets very "worked up" beforehand.  Tr. 53.  He goes to the coffee shop by himself but prefers to have Bolton accompany him.  Tr. 55.  Sometimes on walks together, they return home after only a few blocks because he is too anxious to continue.  *Id.*  Occasionally they go to restaurants for dinner but eat at 11:00 pm to avoid crowds.  Tr. 54.  One really good friend visits Munn at home, but calls beforehand to avoid upsetting Munn.  Tr. 55.

### C.    Analysis

The ALJ found Bolton's testimony "not entirely credible in light of the treatment record and the claimant's daily activities."  Tr. 29.  In support, he first specifically noted the lack of evidence that napping during the day was "a medical necessity."  *Id*.  Although Munn's treating doctors did not advise napping as treatment, Bolton's description of Munn's desire to nap is consistent with his diagnosis of insomnia.  Munn reported fatigue as a symptom of his insomnia.  Tr. 317.  These reports continued even when he was sleeping six to eight hours at night.  Tr. 307, 344.  However, Munn's insomnia was controlled with consistent use of Trazodone.  Tr. 307, 429, 457, 447.

30 - FINDINGS AND RECOMMENDATION

Second, the ALJ found no evidence to support Bolton's testimony of Munn's "difficulties with social interaction." Tr. 29. The ALJ cited Munn's trips to the coffee shop, attendance of AA meetings, grocery shopping, visits with neighbors, and his self-described gregarious nature. *Id.* As explained above, the record contradicts Bolton's testimony that Munn had become "very anti-social." Tr. 52. "Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Molina*, 674 F3d at 1113 (affirming the ALJ's rejection of claimant's attested inability to tolerate even minimal human interaction as inconsistent with her occasional trips outside her house). Although his medically-verified symptoms of fatigue and social fear may cause him some anxiety interacting with people, the record clearly demonstrates that Munn is capable of some public interaction. The ALJ accurately reflected this limitation by determining that Munn was limited to only superficial interaction with the public and coworkers. Tr. 27.

Third, the ALJ noted that contrary to Bolton's testimony, Munn "has not exhibited memory or concentration deficits on mental status exam." That finding is fully supported by Dr. Kruger's evaluation. Tr. 428-32.

For these reasons, the ALJ did not err by rejecting Bolton's testimony.

**V.    RFC**

Munn also disputes the ALJ's determination that Munn retains the RFC to maintain "superficial interaction with the public and co-workers." Tr. 27. Munn contends this determination is inconsistent with the opinions of Dr. Zuk and Silbernagel regarding his agoraphobia.

An RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis," meaning "8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374181, at *1. "The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." *Id.*

The ALJ did not err in formulating Munn's RFC without specifically referencing Dr. Zuk's opinion. As discussed above, Dr. Zuk did not assess any limitations specific to agoraphobia, but only made a passing reference to agoraphobia to describe Munn's continuing anxiety disorder.

Similarly, the ALJ was not required to incorporate limitations assessed by Silbernagel after properly discounting her opinion. *See Batson* at 1197 (omitting evidence from the properly discounted opinion of a treating physician).

## RECOMMENDATION

For the reasons discussed above, the Commissioner's decision should be AFFIRMED.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due Thursday, September 11, 2014. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

///

///

///

32 - FINDINGS AND RECOMMENDATION

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED August 25, 2014.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge